310 Ga. 698
FINAL COPY

S20A1230.  KITCHENS v. THE STATE.

ELLINGTON, Justice.

A Richmond County jury found Willie Kitchens guilty of two counts of malice murder, arson, attempted rape and other crimes in connection with the stabbing deaths of Corey Kemp and Melanie Troupe.[1] In his sole claim of error, Appellant contends that the trial

[1] Kemp and Troupe were killed on June 23, 2011. A Jefferson County grand jury indicted Appellant for two counts of malice murder, two counts of felony murder, two counts of burglary, armed robbery, two counts of false imprisonment, arson in the first degree, criminal damage to property in the first degree, and the rape of Troupe. After Appellant moved for a change of venue, the trial court transferred the case to Richmond County for purposes of trial.  Following a trial in March 2014, the jury found Appellant guilty of both malice murder counts, one count of burglary, armed robbery, two counts of false imprisonment, arson in the first degree, criminal damage to property in the first degree, and attempted rape as a lesser included offense of rape. Appellant was found not guilty of the remaining charges. On the murder counts, the trial court sentenced Appellant to consecutive life sentences without parole. The trial court sentenced Appellant to serve the following prison sentences concurrently with the first murder count: twenty years for burglary, twenty years for arson in the first degree, life for armed robbery, and ten years for the first count of false imprisonment. The trial court sentenced Appellant to serve ten years for the second count of false imprisonment to be served concurrently with his second life sentence for murder. The trial court also sentenced Appellant to serve 30 years in prison for attempted rape to run consecutive to his second life sentence for murder. The trial court merged the

court erred in allowing a witness to offer hearsay testimony that Appellant was responsible for the crimes. We affirm.

Viewed in a light most favorable to the jury's verdicts, the evidence at trial showed the following. Shortly after midnight on June 24, 2011, police and firefighters responded to a fire at Troupe's home in Wadley. Troupe lived with her two-year-old son and her grandmother, both of whom were away on an out-of-town trip when the fire broke out. Kemp was Troupe's boyfriend.

As firefighters forced their way through the locked front door of the home, they saw what appeared to be blood on the threshold. They discovered Kemp's body in the smoke-filled living room. A later-arriving firefighter noticed smoke coming from under a bedroom door. When he opened the door, a fire on the mattress flared up. Troupe's body, which was covered in first- and second-

---

criminal damage to property count with Appellant's conviction for arson in the first degree. Appellant filed a timely motion for new trial on March 26, 2014, which he amended on January 14, 2019. Following a hearing, the trial court denied Appellant's amended motion for new trial on April 3, 2020. Appellant filed a timely notice of appeal, and the case was docketed to the August 2020 term of this Court and submitted for a decision on the briefs.

degree burns, was lying in the bedroom with her hands tied behind her back with what appeared to be shoelaces and with her shirt pulled up above her breasts. Both victims were in a state of partial undress.

The firefighters observed that an eye of the stove had been left burning in the kitchen. An arson investigator later determined that one fire had been ignited on top of sofa cushions placed on Kemp's body. A second fire had been started on bedding material lying on Troupe's body and the mattress.

The medical examiner testified that Kemp and Troupe had no smoke in their lungs and did not die as a result of the fire. Rather, both died as a result of multiple stab wounds. Kemp had cuts and stab wounds on his head, neck, chest, and abdomen, as well as defensive wounds on his arms. His testicles were also bruised. Troupe had been stabbed 39 times and had injuries to her head, neck, chest, back, hands, and abdomen.

A GBI investigator who responded to the crime scene canvassed the neighborhood for witnesses. He spoke with Appellant,

3

who lived across the street from Troupe. The investigator testified that Appellant was nervous, his hands were shaking, and he had cuts on his hands and scratches on his neck. Appellant agreed to be interviewed at the police station.

During the interview, Appellant said that he had never been inside Troupe's home, although he had worked in the yard and installed an air conditioning window unit from the outside. Appellant initially declined to submit a DNA sample and left the station. However, he returned about 20 minutes later and agreed to give the sample if the agents promised not to search his home. After the agents informed Appellant that they could not make such a promise, Appellant allowed the sample to be taken.

Appellant was arrested later that day. Agents photographed Appellant's injuries, which consisted of fresh cuts on his hand and scratches on his face and body. When Appellant was arrested he was wearing, among other things, a pair of size 10½ Reebok brand tennis shoes.

At the crime scene, agents found bloody footprints that could

not be attributed to the first responders. The footprints were found on the floor underneath Kemp's body, on the back steps, and in the yard leading away from the house. At trial, a GBI forensic examiner testified that the shoeprints were made by a size 101/2 Adidas brand tennis shoe. Two pairs of Adidas brand tennis shoes, one pair size 11 and another pair size 101/2, were recovered from Appellant's residence, but the GBI examiner was not able to match those shoes with the shoeprints found at the crime scene. Video taken at a gas station on the day of the murder showed Appellant making a purchase there while wearing Adidas brand tennis shoes. The shoes that Appellant was seen wearing in the video were never found by police.

In a wooded area near Troupe's home, officers found a child's yellow shirt and a white hand cloth lying a few feet apart on a mound along a path. Troupe's grandmother testified that the yellow shirt belonged to Troupe's son. Officers also found an adult's green shirt lying about 20 feet away from the mound. A witness testified that she had seen Appellant wearing that shirt at a club the week before

the incident.

Blood stains on the yellow shirt tested positive for DNA that matched the DNA of Troupe and Kemp. The blood on the green shirt tested positive for Kemp's DNA. Appellant's DNA was found on the white cloth. In Appellant's yard, police found a towel, a white and blue child's shirt, and a purse. Kemp's blood was found on the white towel and the child's shirt. The purse contained Troupe's identification card.

Several witnesses testified at trial that Appellant and Troupe were more than acquaintances. Jimmy Williams, Appellant's friend, testified that about a year before the murders, Appellant told him that he was in a romantic relationship with Troupe. According to Williams, Appellant later informed him that Troupe and Kemp were "together" in a relationship. Williams characterized Appellant as having been obsessed with Troupe.

One of Troupe's friends testified that Troupe said that Appellant had been stalking her. The friend noticed that Troupe did not like being alone and would stay with her when Troupe's

grandmother was not home. Another witness, Troupe's co-worker, testified about an incident that occurred about three months before the killings. She testified that Troupe pointed a man out to her and said "that guy keep[s] bothering me. I . . . told him I don't want him." The witness saw that the man "looked like one of the Kitchens boys."

Another of Troupe's friends testified that she spoke with Troupe on the phone as Troupe's grandmother packed to go out of town. The friend said that Troupe told her that "you know who" was standing outside her home. Based on her other conversations with Troupe, she understood that Troupe was referring to Appellant.

The prosecution also offered other acts evidence that showed that Appellant had choked an ex-girlfriend until she lost consciousness. In another incident, the ex-girlfriend testified, Appellant tied her hands behind her back and had sexual intercourse with her against her will.

Williams also testified over objection about a statement made to him by Debra Kitchens, Appellant's sister. According to Williams, he and his girlfriend drove to the crime scene between 8:00 and 9:00

on the morning after the killings. Debra walked up to the car and said "Willie did it."

Debra testified at trial before Williams did. The prosecutor did not ask Debra during her testimony whether she told Williams that Appellant had committed the murders. Nor was she recalled to the stand after Williams testified. Debra testified to the following: On the evening of the murders, she sat outside her home with Appellant and others. Appellant left the premises around 9:00 p.m., and Debra left about 30 minutes later. Debra returned home around 11:30 p.m., at which time she went straight to her bedroom. She testified that she did not see Appellant. About ten minutes later, a cousin alerted her to the fire at Troupe's home. After coming out of her room, Debra saw Appellant sitting on the sofa. She went outside and then went to the scene of the fire with others. She did not see Appellant at the scene.

1. Appellant does not dispute the legal sufficiency of the evidence supporting his convictions. Nevertheless, we have reviewed the record and conclude that, when viewed in the light most

8

favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).[2]

2. Appellant contends that the trial court erred in allowing Williams to give inadmissible hearsay testimony that Debra told Williams that Appellant "did it." The trial court admitted the testimony over objection after concluding that Debra's statement fell within the present sense impression and excited utterance exceptions to the rule against hearsay.[3] See OCGA § 24-8-803 (1) (defining present sense impression exception to the rule against hearsay); OCGA § 24-8-803 (2) (defining excited utterance exception

---

[2] We remind litigants that this Court will end its practice of considering the sufficiency of the evidence sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 391-392 (4) (846 SE2d 83) (2020). This Court began assigning cases to the December term on August 3, 2020.

[3] Kitchens was tried in 2014 under Georgia's current Evidence Code. See Ga. L. 2011, pp. 99, 214, § 101.

to the rule against hearsay). Appellant argues that the statement was not a present sense impression or an excited utterance.[4]

Assuming without deciding that the trial court abused its discretion in admitting the hearsay, any error was harmless. "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so. The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Williams v. State*, 302 Ga. 147, 153-154 (3) (805 SE2d 873) (2017) (citation and punctuation omitted).

The evidence showed that Appellant was obsessed with Troupe and had been stalking her, and that Troupe saw him outside her home on the day of the murders as her grandmother prepared to leave for an out-of-town trip. Appellant wore size 10½ shoes, the

---

[4] Appellant also argues that the hearsay was not part of the "res gestae" because the declarant did not speak from personal knowledge. The "res gestae" exception to the rule against hearsay is not recognized under our current Evidence Code and was not a ground for the statement's admission by the trial court. See, e.g., *Johnson v. State*, 292 Ga. 785, 789 n.4 (741 SE2d 627) (2013) ("[T]he new Evidence Code does not use the term 'res gestae.'").

same size of the bloody shoeprints found at the murder scene. A hand cloth with Appellant's DNA was found on a trail behind Troupe's home near clothing containing the victims' blood. That clothing included a green shirt that a witness had seen Appellant wearing and that forensic evidence showed had been splattered with Kemp's blood. A purse containing Troupe's identification was recovered from Appellant's yard along with a towel and a shirt containing Kemp's blood. When taken into custody on the day after the murders, Appellant's hand was freshly cut and there were numerous scratches on his body. Troupe's body was found with her hands tied behind her back and her shirt pulled up above her breasts. A former girlfriend of Appellant testified that he bound her hands behind her back and had sexual intercourse with her against her will. In light of the strong evidence of Appellant's guilt, it is highly probable that any error in admitting Debra's out-of-court statement, which did not indicate why she believed Appellant committed the crimes, did not contribute to the verdicts. See *Hampton v. State*, 308 Ga. 797, 802-803 (2) (843 SE2d 542) (2020)

11

(assuming error in admission of hearsay, the error was harmless given, among other things, forensic evidence pointing to appellant's guilt); *Perez v. State*, 303 Ga. 188, 190-191 (2) (811 SE2d 331) (2018) (pretermitting error in the admission of the victim's hearsay statement, it was highly probable that the admission did not contribute to the verdict given the overwhelming evidence of appellant's guilt).

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 1, 2021.
Murder. Jefferson Superior Court. Before Judge Palmer.
*Aaron S. Palmer*, for appellant.
*S. Hayward Altman, District Attorney, Kelly J. Weathers, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.