NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: April 30, 2024

S24A0037. HOOKS v. THE STATE.

PINSON, Justice.

Appellant Kiervon Armani Hooks was convicted of felony murder and possession of a firearm during the commission of a felony, both arising from the shooting death of Brandon Ray Foster.[1] On appeal, Hooks contends the evidence was not sufficient to sustain

---

[1] Foster was shot in the late hours of September 26, 2017, and died early the next morning. On December 18, 2017, a grand jury returned an indictment charging Hooks with aggravated assault (Count 1), felony murder predicated on aggravated assault (Count 2), and possession of a firearm during the commission of a felony (Count 3). At a jury trial from February 4-6, 2019, the jury found Hooks guilty of all counts. On February 6, 2019, the trial court sentenced Hooks to life without parole for felony murder (Count 2) and merged the aggravated assault count into the felony murder conviction. Hooks was also sentenced to serve five years in prison consecutive to his felony-murder sentence for possession of a firearm during the commission of a felony. Hooks, through trial counsel, filed a timely motion for new trial on February 11, 2019, which he amended through new counsel on April 13, 2023. Hooks waived hearing on the motion for new trial, and the trial court denied the motion on April 25, 2023. Hooks timely filed a notice of appeal on May 23, 2023. His appeal was docketed to the term of court beginning in December 2023 and submitted for a decision on the briefs.

his convictions because no physical evidence or eyewitness testimony linked him to the crime scene and the State did not present enough evidence to exclude the possibility that someone else shot Foster. But the evidence, which we recount in detail below, was constitutionally sufficient, so we affirm his convictions.

1. Near midnight on September 26, 2017, Dawn McCorkel was inside her apartment at the Garlington Heights apartment complex when she heard a gunshot "right next to [her] window." She went outside five-to-ten minutes later, stepped off her porch, and saw someone was lying on the ground four-to-five feet away, on the left side of Building 60. She walked over to the person, Foster, whom she recognized because he had been her neighbor for several years. Foster had been shot, but he was still alive, and McCorkel called 911.

Foster told McCorkel that "Buddha" shot him. McCorkel knew Hooks as "Buddha." She did not know anyone else who went by the nickname "Buddha," although she said she had "heard of other people in town with that nickname." When Lieutenant Kylie Carter arrived at the scene, Foster was lying on the ground between

McCorkel's apartment and Building 90 and had a gunshot wound to his abdomen. Police found a spent .40-caliber shell casing near Building 90. McCorkel's apartment was at the end of Building 60, which backed up to the rear of Building 90. Building 90 could be seen from McCorkel's side window.

Lieutenant Carter asked Foster who shot him, and Foster said "Buddha." Carter asked again, and Foster again said "Buddha" shot him. The lead detective, Larry Hill, did not know who "Buddha" was at first. Another officer at the scene, Officer Matthew Brooks, knew that Hooks, who used to be Officer Brooks's neighbor at a different apartment complex, now lived in Garlington Heights and went by the nickname "Buddha." Officer Brooks knew Hooks and his family and did not know anyone other than Hooks who went by the nickname "Buddha."

Although Officer Brooks did not know Hooks's apartment number, he knew that Hooks's sister lived in an apartment in Building 90, which was the building the spent shell casing was found next to. Officer Brooks went to that apartment, found the door was cracked

3

open, and knocked. Hooks answered the door and briefly spoke with Brooks. Hooks said that he had been inside his sister's apartment all night, except for when he had stepped out to smoke a cigarette. Police then searched the apartment but found no weapon.

Foster died from the gunshot wound to his abdomen later that night. The medical examiner recovered a bullet that went through Foster's abdomen and liver, then lodged in his right kidney and killed him.

Brian Lepper, a GBI firearms and tool mark examiner, examined the shell casing collected at the scene and the bullet recovered during Foster's autopsy. Lepper determined that both were .40-caliber and consistent with having been fired from a High Point .40-caliber pistol or another brand of .40-caliber gun.

At trial, Detective Hill testified that Hooks was arrested for the shooting after investigators had exhausted other possible leads. McCorkel, the neighbor who found Foster, identified Hooks in the courtroom as the only person she personally knew as "Buddha" and testified that it would have only taken "a second" to go from the

4

location where Foster was found to Building 90, where Hooks was that night. Officer Brooks also identified Hooks in the courtroom as the person he knew as "Buddha." Also at trial, the State introduced a to-scale computer-generated diagram of the crime scene, which had been created based on measurements and photographs taken at the crime scene. The photographs and diagram were admitted into evidence and an officer referenced them to point out the locations of Buildings 60 and 90, Foster, and the spent shell and their proximity to one another.

2. Hooks contends that the evidence was not sufficient to convict him of Foster's murder because no physical evidence connected him to the crime, and although Hooks went by the nickname "Buddha," there was evidence that more than one person went by that nickname, and there was no evidence describing the shooter to establish that Hooks—and not another "Buddha"—shot Foster.

(a) We review the constitutional sufficiency of the evidence by reviewing the evidence at trial in the light most favorable to the verdicts to determine whether a rational trier of fact could have found

5

the defendant guilty beyond a reasonable doubt, without weighing the evidence or resolving conflicts in testimony. See *Weems v. State*, 318 Ga. 98, 101 (2) (a) (897 SE2d 368) (2024) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979); *Byers v. State*, 311 Ga. 259, 266 (2) (857 SE2d 447) (2021)). To meet its burden, the State was "not required to produce any physical evidence," so long as there was "competent evidence" to prove each element of the crime. See *Johnson v. State*, 296 Ga. 504, 505 (1) (769 SE2d 87) (2015). We defer to the jury's resolution of any conflicts in the evidence, the credibility of witnesses, and the drawing of reasonable inferences from the facts. See *Perkins v. State*, 313 Ga. 885, 891 (2) (a) (873 SE2d 185) (2022).

A person commits felony murder when, "in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1 (c). Here, the predicate felony was aggravated assault with a deadly weapon, which occurs when someone "[a]ttempts to commit a violent injury" to another or "[c]ommits an act which places another in reasonable apprehension of

6

immediately receiving a violent injury" by use of a "deadly weapon." OCGA §§ 16-5-20 (a), 16-5-21 (a) (2).

The evidence here, although largely circumstantial, authorized the jury to convict Hooks of these offenses. Hooks points out that the murder weapon was not found, and no witnesses saw Hooks outside Buildings 60 or 90 at the time of the shooting. But circumstantial evidence alone can be constitutionally sufficient, see, e.g., *Weems*, 318 Ga. at 101 (2) (a)-(b), and the evidence here meets that standard. That evidence showed that Foster was shot and killed with a .40-caliber bullet when he was just outside McCorkel's apartment, which was at the end of Building 60 and next to Building 90. A spent .40-caliber shell casing was found near Building 90, and Hooks answered the door of his sister's apartment in that building and said he had been there all night, except for when he went out for a cigarette. The jury viewed photographs and a to-scale diagram showing the short distance between all the apartments in Building 90, including Hooks's sister's apartment, and the location of Foster and the spent shell. Before he died, Foster said multiple times that

7

"Buddha" shot him, and multiple witnesses identified Hooks—who was at his sister's apartment a short distance away from where the shooting occurred and next to where the spent shell casing was found—as the only person they knew who went by the nickname "Buddha." Viewed in the light most favorable to the verdicts, this evidence authorized the jury to conclude that Hooks was the "Buddha" who shot Foster and to find him guilty of the felony murder of Foster predicated on the aggravated assault of shooting him, and for possession of a firearm during the commission of that crime. See *Rodriquez v. State*, 309 Ga. 542, 546 (1) (847 SE2d 303) (2020) (concluding that sufficient evidence supported the felony murder conviction where circumstantial evidence, including cell phone records placing the defendant at or near the crime scene, which was within walking distance of his apartment, and a prior altercation between the defendant and victim, authorized the jury to find that the defendant, and not another person, shot the victim). See also *Hill v. State*, 276 Ga. 220, 221 (3) (576 SE2d 886) (2003) ("Evidence that the defendant or an accomplice either carried or was within arm's

length of a weapon during the commission of a crime authorizes a finding of guilt of violating OCGA § 16-11-106 (b).").

(b) When a conviction is based on circumstantial evidence, the State must present sufficient evidence to "exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. But "not every hypothesis is reasonable," and whether a given hypothesis is reasonable is a determination for the jury that we do not disturb "unless it is insufficient as a matter of law." See *Drennon v. State*, 314 Ga. 854, 861-862 (3) (880 SE2d 139) (2022) (cleaned up).

Hooks contends that the evidence against him was entirely circumstantial and that the State did not exclude beyond a reasonable doubt the possibility that Foster's identification of "Buddha" as the shooter could have referred to someone other than Hooks. See OCGA § 24-14-6. Even if we assume that the evidence was entirely circumstantial,[2] Hooks's nickname, which Foster gave to identify his

---

[2] Generally, an eyewitness's identification of a defendant is direct evidence of guilt. See *Bates v. State*, 317 Ga. 809, 814 (2) n.3 (896 SE2d 851)

9

shooter, was not the only evidence linking him to the crime. As we just discussed, Foster was shot with a .40-caliber bullet when he was between Building 60 and Building 90, a spent .40-caliber shell casing was found next to Building 90, and Hooks—whose nickname is "Buddha"—was at his sister's apartment in Building 90 on the night of the shooting. In support of his hypothesis that another "Buddha" was the shooter, Hooks points only to McCorkel's testimony that she had "heard of other people in town" going by the nickname "Buddha." But McCorkel, who lived in the same apartment complex as Hooks and Foster, clarified that Hooks was the only person she knew who went by the name "Buddha," and Officer Brooks, who had been Hooks's neighbor at a different apartment complex, testified that Hooks was the only "Buddha" he knew. Also, the lead detective testified that after learning that Foster had identified "Buddha" as the

---

(2023). See also *Gittens v. State*, 307 Ga. 841, 843 (1) n.2 (838 SE2d 888) (2020). ("Eyewitness testimony based on the witness's firsthand observations of the crime is direct, not circumstantial, evidence."). For purposes of addressing Hook's argument, we assume without deciding that Foster's identification of his shooter by the nickname "Buddha" was circumstantial evidence because police then used that information and additional inferences to identify Hooks as the "Buddha" Foster had referred to.

shooter and that Hooks went by that nickname, he exhausted other leads before arresting Hooks for the murder. These identifications of Hooks as "Buddha," combined with the close proximity between the location of the spent shell casing that matched the fatal bullet and the apartment where Hooks was that night, authorized the jury to reject as unreasonable the hypothesis that another "Buddha" with no connection to the crime scene was the shooter. See *Drennon,* 314 Ga. at 861-862 (3). Given this evidence, the jury was authorized to reject Hooks's theory that some other person with the same nickname shot Foster. See *Graves v. State*, 306 Ga. 485, 486-487 (1) (2019) (concluding that circumstantial evidence, including video showing the defendant alone exit a taxi after the taxi crashed and on the night the taxi's driver was shot, was sufficient for the jury to reject his contention that there was another passenger in the same taxi but not shown in the video who had shot the taxi driver). Cf. *Moulder v. State*, 317 Ga. 43, 44-47 (1)-(2) (891 SE2d 903) (2023) (even without any physical evidence linking the defendant to the crime scene or evidence that the defendant went by the nickname

11

"Youngster," whom the victim said he was with before he was found dead, other evidence—including that the defendant knew the victim, used to live and had a family member who lived near where the victim's car was found, and had been in Georgia on the day of the shooting—was sufficient to authorize the jury to reject the defendant's hypothesis that an unidentified person who went by the nickname "Youngster," and not the defendant, was the shooter).

*Judgment affirmed. All the Justices concur.*