NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: April 8, 2025

S25A0161.  KINGDOM v. THE STATE.

COLVIN, Justice.

Appellant Devin Kingdom appeals his convictions for malice murder and other crimes related to the shooting death of Cierra Ford and the aggravated assault of Tyrique Lobban.[1] On appeal,

---

[1] The crimes occurred on November 25, 2016. On April 21, 2017, a Fulton County grand jury returned a 14-count indictment against Appellant, Joseph Alexander Clarke, Malik Kendall Ortiz, and Gregory Battle. Appellant was charged with participation in street gang activity (Count 1), malice murder (Count 2), felony murder (Counts 3, 4, 5, 6), home invasion in the first degree (Count 7), aggravated assault against Ford (Count 8), aggravated assault against Lobban with a shotgun (Count 9), aggravated assault against Lobban with a handgun (Count 10), aggravated battery against Lobban (Count 11), burglary in the first degree (Count 12), and possession of a firearm during the commission of a felony (Counts 13 and 14).

Appellant and Ortiz were jointly tried before a jury from May 7 through 17, 2018, and the jury found Appellant guilty on all counts except Counts 1 and 6. The trial court sentenced Appellant to life in prison for malice murder (Count 2) and home invasion in the first degree (Count 7). The court also imposed 20-year concurrent sentences for the aggravated assault with a deadly weapon charge (Count 10) and the aggravated battery charge (Count 11). And it imposed five-year consecutive sentences for the charges of possession of a firearm during the commission of a felony (Counts 13 and 14). The remaining

Appellant argues that the trial court erred by admitting testimony regarding an out-of-court identification by a deceased declarant in violation of the Sixth Amendment to the United States Constitution and Georgia law. Appellant further argues that, to the extent his trial counsel opened the door to this out-of-court identification, Appellant's counsel was constitutionally ineffective. As explained below, however, these arguments fail, and we affirm Appellant's convictions.

1. The trial evidence showed the following. Lobban, Malik Ortiz, Joseph Clarke, Gregory Battle, and Jabar Brady were friends in New York before moving to Georgia and eventually settling into a townhome around August 2016. Ortiz, Clarke, and Battle, however, moved out of the townhome on October 29 because they would not contribute to rent. Appellant — whom Lobban had also

charges were either merged or vacated by operation of law.

Appellant filed a motion for new trial on May 23, 2018. Appellant amended his motion for new trial several times, acting either pro se or through new counsel, the last of which was filed by counsel on August 24, 2022. The trial court denied the Appellant's motion for new trial on February 5, 2024, and Appellant filed a timely notice of appeal with this Court on March 6, 2024, which was amended on April 24, 2024. The appeal was docketed to this Court's term beginning in December 2024 and submitted for a decision on the briefs.

known from New York and who frequently socialized with Clarke at the townhome — helped Ortiz and Battle move out. According to Lobban, Appellant came back later that day, asked Lobban how he made money, and told Lobban that he needed to "clear [his] name" after "snitching" about an incident in New York.[2]

Tension remained high among the group post move-out. Lobban testified that, in mid-November, Clarke told Brady that Clarke was going to shoot Lobban after Lobban initially refused to return a gun he had borrowed. On Thanksgiving Day, Lobban made a social media post showing him in the townhome with about $17,000 in cash. Lobban testified that he noticed Brady's phone being called that day. Lobban further testified that he picked up Brady's phone, that Appellant was on the other end of the line, and that Appellant said, "Who is that, Jubby? All right," before hanging up.[3]

Tension neared a peak hours later. Lobban returned to his

---

[2] At trial, Lobban said that Appellant did not indicate who Lobban had "snitch[ed]" on.

[3] Trial evidence established that "Jubby" is Lobban's nickname.

townhome around 1:30 a.m. on November 25, 2016 after celebrating Thanksgiving. When he returned, he briefly saw Brady and his new roommate, Tyrique Jackson, who were playing video games together in Brady's bedroom. Lobban then went to his own bedroom, where he was later joined by his girlfriend, Ford, after she returned from her own Thanksgiving celebrations. Jackson testified that Lobban came to Brady's bedroom about ten or fifteen minutes after Ford arrived and asked Jackson to go purchase some "roll-up paper" for smoking marijuana. Jackson agreed. When Jackson left, Lobban and Ford were inside Lobban's bedroom with the door closed.

According to Lobban, intruders kicked their bedroom door open after he and Ford had been lying in bed for about ten minutes. At trial, Lobban testified that he saw four people in the doorway: Clarke, Ortiz, Battle, and a man Lobban identified as "Chubbs." According to Lobban, Ortiz and Battle ran away, but "Chubbs" and Clarke "bum-rushed" through the door with a shotgun and handgun respectively. Lobban testified that "Chubbs" fired the shotgun; that during the shooting, he heard a "chi-chi, boom" sound eight times;

4

and that "Chubbs" then "ran out the room." Lobban further testified that he "tried to get up" after the room "was . . . quiet for . . . a minute." According to Lobban, Clarke then began shooting with a handgun about "four or five times."

A medical examiner testified that Ford took a fatal shot to the head from a shotgun, and a surgeon testified that Lobban sustained gunshot wounds to his chest, abdomen, thigh, and arm from what "appeared to be . . . various weapons, mostly bullets" from a "shotgun possibly." After the shooters retreated, Lobban dialed 911 at 2:49 a.m. and 2:54 a.m. A neighbor witnessed four individuals loading unidentified items into a white car around that time.[4]

Lobban testified that Brady came to his bedroom while he was "[i]n the process of . . . calling 911." Lobban further testified that he asked Brady for help, but Brady "panicked and ran out [of] the room." Jackson testified that when he returned to the townhome, he found Brady in his bedroom crying and packing his clothes and that

---

[4] The neighbor testified that she left her daughter's house at 2:31 a.m. that day before stopping at a gas station and then going to her townhome early that morning.

the two left the house together early that morning.

Lobban told dispatchers that he was shot by "Chubbs" and Clarke. Officers arrived and pronounced Ford dead on the scene but Lobban underwent surgeries and survived. Brady died by suicide almost a month after the incident.

During their investigation, detectives determined that Appellant was the person Lobban referred to as "Chubbs." After an extensive surgery, Lobban mistakenly told detectives that Clarke was "Chubbs," but he promptly clarified that the two were separate people. When detectives asked Lobban for "Chubbs's" real name, Lobban stated that he did not know "Chubbs" or associate with him. But after further questioning, detectives realized that when Lobban said that he did not "know Chubbs," he meant that he did not consider him a close friend. Indeed, Lobban told detectives that he had seen "Chubbs" more than ten times, that "Chubbs" had been to Lobban's townhouse with Clarke, and that the three would drink and smoke together. Lobban also had a number for Chubbs in his phone, which detectives traced back to Appellant. Lobban was later

6

shown a single photograph of Appellant and expressed "a thousand percent" certainty that the photograph was of the individual he knew as "Chubbs."

Other evidence linked Appellant to the name "Chubbs" and to the crime, namely, evidence placing his cell phone and his girlfriend's car, a white Hyundai Sonata, near the scene. Appellant's girlfriend testified that "Chubbs" was one of Appellant's nicknames. And she further testified that around 1:00 a.m. on the day of the crime, she went to Appellant's apartment, parked her car in front of his complex, and left her car keys in her jacket by the door before she met Appellant in bed. Though she claimed that Appellant spent the night with her, she also testified that she had taken medication that "allow[ed] [her] to sleep." Later that morning, she could tell that someone else had driven her car. A tag reader photographed her car "half a mile south" from Lobban's townhome about 30 minutes before the shooting. And cell phone and location data for a phone number that both Lobban and Appellant's girlfriend had provided to detectives for Appellant showed that Appellant's cell phone was

7

within the vicinity of the crime scene within minutes of Lobban dialing 911.[5]

2. Appellant argues that the trial court erred by admitting a deceased declarant's out-of-court statement in violation of Appellant's Sixth Amendment right to confront the witnesses against him. This claim fails.

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The United States Supreme Court held in *Crawford v. Washington*, 541 U.S. 36 (124 SCt 1354, 158 LE2d 177) (2004) that the "admission of out-of-court statements that are testimonial in nature violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination." *Pitts v. State*, 280 Ga. 288, 288 (627 SE2d 17) (2006). "[F]or evidence to fall within the ambit of the Confrontation Clause,

---

[5] Appellant's girlfriend testified that his cell phone was a communal phone used for "business."

it must be both a 'statement' and 'testimonial.'" *State v. Gilmore*, 312 Ga. 289, 293 (2) (b) (862 SE2d 499) (2021) (citations omitted). "A statement is testimonial if its primary purpose was to establish evidence for use in a future prosecution." *Campbell v. State*, 320 Ga. 333, 350 (5) (907 SE2d 871) (2024) (citation and punctuation omitted).

At the preliminary hearing, Detective J.T. Williams testified that Brady identified Appellant, Clarke, and Ortiz each in single photographs. Defense counsel later filed a motion in limine to exclude out-of-court statements made to law enforcement "during questioning" and "other form[s]" of "testimonial statement[s]" made out-of-court. Defense counsel specifically named Brady as a declarant who would be unavailable to testify at trial. The trial court "reserve[d] ruling as to the admissibility of any statements" after holding pretrial hearings on the defense's motion in limine and a related notice of intention from the prosecution to introduce statements that Brady made to individuals who were not law enforcement officers.

During a bench conference at trial, the prosecution sought the court's permission to ask Detective Williams whether Brady made an identification during an interview. The prosecutor proffered that the answer would be "yes," but stated that he would not ask the detective who Brady identified. Appellant's counsel objected on hearsay grounds and under the Confrontation Clause. Ortiz's counsel also objected because, in counsel's view, Detective Williams's testimony would implicate Ortiz.

The trial court permitted the questioning, which went as follows:

> PROSECUTOR: Now, Detective Williams, without telling me what anybody said at all, it's been talked [about] both during direct and cross-examination that Mr. Jabar Brady was interviewed late in the day on November 25th of 2016. Do you remember that?
> WILLIAMS: Yes, sir.
> PROSECUTOR: And during that interview, was Jabar Brady able to make identification?
> WILLIAMS: Yes, sir.

Appellant argues that this testimony violated his rights under the Confrontation Clause because Brady's identification was a testimonial statement, and Appellant did not have an opportunity

10

to confront him.

Pretermitting whether Detective Williams's testimony implicated the Confrontation Clause, we hold that the trial court's admission of the testimony was harmless beyond a reasonable doubt because the evidence of Appellant's guilt was overwhelming. As we have explained,

> A constitutional error is harmless when the State proves beyond a reasonable doubt that the error did not contribute to the verdict, such as when the evidence at issue is cumulative of other properly-admitted evidence or when the evidence against the defendant is overwhelming.

*Jones v. State*, 314 Ga. 605, 616 (4) (878 SE2d 505) (2022) (citation and punctuation omitted). Here, overwhelming evidence of Appellant's guilt included Lobban's eyewitness testimony in which he identified Appellant as the shooter; Lobban's immediate identification of Appellant by the nickname "Chubbs" in his 911 phone call; Lobban's "thousand percent" certainty that the photo officers showed him of Appellant was "Chubbs"; Appellant's accessibility and connection to his girlfriend's car that was spotted

11

near the scene by a tag reader; and cell phone data showing Appellant's phone near the crime scene around the time that Lobban dialed 911. Moreover, the detective's testimony that Brady made an identification never clearly implicated Appellant, who was charged with three other co-indictees, one of whom he was jointly tried with. The evidence was overwhelming, and the admission of Detective Williams's testimony was harmless beyond a reasonable doubt. See id. at 615-616 (4) (pretermitting whether the trial court admitted evidence in violation of the Sixth Amendment and holding that any error was harmless beyond a reasonable doubt in light of the "substantial evidence support[ing] [the appellant's] convictions," which "included the eyewitness testimony of [a bystander] and her positive identification of [the appellant]" as the shooter); *Sutton v. State*, 295 Ga. 350, 352-353 (3) (759 SE2d 846) (2014) (holding that any Confrontation Clause violation was harmless beyond a reasonable doubt, in part, because the erroneously admitted testimony was "cumulative of other admissible evidence placing [the] appellant in the house" where the murder occurred); *Ardis v.*

*State*, 290 Ga. 58, 60-63 (2) (a) (718 SE2d 526) (2011) (holding that a Confrontation Clause violation was harmless beyond a reasonable doubt where other properly-admitted evidence against the accused was overwhelming, including, among other things, that the appellant had access to his girlfriend's car which matched the description of a car that witnesses saw at the crime scene); *Veasley v. State*, 275 Ga. 516, 518 (2) (570 SE2d 298) (2002) (pretermitting whether the trial court admitted evidence in error and holding that its admission was harmless beyond a reasonable doubt "inasmuch as there was an eyewitness to the crimes and other evidence linking [the appellant] with the murder and assaults"). Cf. *Rodriguez v. State*, 309 Ga. 542, 545-546 (1) (847 SE2d 303) (2020) (holding that "the State presented strong circumstantial evidence of [the appellant's] guilt," which included, evidence that, "about 12 hours before [the victim's] death," the appellant and the victim were in an altercation, after which, the appellant told "multiple people that he was going to kill [the victim]" and evidence of "[c]ell phone records show[ing] that [the appellant] was at or near the crime scene . . .

during the time that [the victim] was killed"); *Wainwright v. State*, 305 Ga. 63, 70 (4) (823 SE2d 749) (2019) (holding that "evidence of [the appellant's] guilt was strong" when "among other things, the surviving victim identified [the appellant] — in a photographic lineup and again at trial — as the [shooter]," a witness who was familiar with both the appellant and his co-defendant saw the two running from the crime scene and heard the appellant admit to shooting a victim, and "cell-phone records confirmed that [the appellant] was in the area at the time of the murder").

2. Appellant also argues that the trial court erred in admitting inadmissible hearsay in violation of OCGA § 24-8-802. This claim also fails.

Appellant contends that Detective Williams's testimony that Brady made an identification contained inadmissible hearsay. Assuming without deciding that Detective Williams's testimony did contain inadmissible hearsay, any error in admitting that testimony was harmless under the nonconstitutional harmless error standard. See *Kitchens v. State*, 310 Ga. 698, 702 (2) (854 SE2d 518) (2021)

14

(applying the nonconstitutional harmless error standard to the appellant's hearsay claim). "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." See id. (citation and punctuation omitted). Here, the admission of Detective Williams's testimony was harmless for the reasons explained in Division 1. Thus, Appellant's hearsay claim fails.

3. Finally, Appellant argues that trial counsel rendered ineffective assistance by opening the door to Detective Williams's testimony that, according to Appellant, introduced Brady's out-of-court identification. This claim also fails.

To prevail on an ineffective-assistance-of-counsel claim, Appellant "must show both that his counsel's performance was constitutionally deficient and that he was prejudiced by this deficient performance." See *Lynn v. State,* 310 Ga. 608, 612 (4) (852 SE2d 843) (2020) (citing *Strickland v. Washington,* 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984)). "When evaluating whether an appellant has established prejudice . . . we review the record de novo

15

and weigh the evidence as we would expect reasonable jurors to have done." *Harmon v. State*, 319 Ga. 259, 265 (3) (903 SE2d 28) (2024) (citation and punctuation omitted).

Here, even assuming without deciding that trial counsel opened the door to Brady's statements and was deficient for doing so, Appellant cannot show prejudice because he cannot show that but for trial counsel's deficiency, there was a reasonable probability that the jury would not have convicted him. See *Bell v. State*, 294 Ga. 443, 446 (3) (754 SE2d 327) (2014). The evidence against Appellant was overwhelming for the reasons explained in our harmless error analysis. See *Ardis*, 290 Ga. at 60-63 (2) (a) (holding that trial counsel was not ineffective for failing to object to an out-of-court statement that violated the appellant's Confrontation rights when other properly admitted evidence against the appellant was overwhelming, including testimony that identified the appellant as the get-away driver of a car that matched the description of his girlfriend's vehicle). Accordingly, Appellant's claim fails.

4. Finally, we must consider whether Appellant suffered

cumulative prejudice from the errors he alleges. See *Zayas v. State*, 319 Ga. 402, 414 (4) (902 SE2d 583) (2024). We hold that he did not "because the harm from the assumed errors and assumed deficiency is the same [in this case] . . . and we have concluded that the[y] . . . did not likely affect the outcome of the trial." Id. (citation and punctuation omitted).

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel, Ellington, McMillian, LaGrua, and Pinson, JJ, concur.*