321 Ga. 820
FINAL COPY

S25A0514. BOONE v. THE STATE.

L<small>A</small>G<small>RUA</small>, Justice.

Appellant Pereia Boone appeals his convictions for malice murder and other crimes related to the stabbing death of Bobby Holt.[1] On appeal, Boone argues that his convictions should be reversed based on the following contentions: (1) the evidence was insufficient to support the verdicts in this case because the only evidence presented against Boone was his custodial confession, which was uncorroborated by other independent evidence at trial;

---

[1] Holt was fatally stabbed on March 18, 2019. On May 20, 2019, a Crisp County grand jury indicted Boone and his co-defendant Katrea Williams, individually and as parties to the crime, for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), and two counts of aggravated assault (Counts 3 and 4). Boone was tried separately from May 24 to May 26, 2021, and the jury found Boone guilty on all counts. The trial court sentenced Boone to life without the possibility of parole on Count 1 (malice murder), plus 20 years to run concurrently on Count 4 (aggravated assault). The remaining counts merged or were vacated by operation of law. Boone filed a timely motion for new trial, which he later amended through new counsel on January 5, 2023, and July 28, 2024. After holding an evidentiary hearing on the motion for new trial, the trial court denied the motion on October 15, 2024. Boone filed a timely notice of appeal to this Court, and the case was docketed to the April 2025 term of this Court and submitted for a decision on the briefs.

(2) the trial court abused its discretion by admitting improper other-acts evidence for the purpose of showing Boone's intent under OCGA § 24-4-404 (b); and (3) Boone's trial counsel was constitutionally ineffective for failing to object to statements the prosecutor made about Boone's character during the State's closing argument. For the reasons that follow, we affirm Boone's convictions.

Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that, around 2:30 p.m. on March 18, 2019, Eugene Bell arrived at an apartment complex in Cordele to collect his sister's mail, and as he approached his sister's apartment, Bell noticed a "male and a female" — later identified by Bell as Boone and Katrea Williams — leaving Holt's apartment, which was located next door. Williams suddenly "grabbed" Bell and "wouldn't turn loose" for "[a]t least five to ten minutes," even when Bell tried "to pull her off." Williams eventually let go, and she and Boone walked "around the corner [of] the complex," "arguing."

Lissa Faircloth, who worked in a Housing Authority facility located adjacent to the apartment complex, testified that she

2

witnessed the incident between Boone, Williams, and Bell through her office window. According to Faircloth, she saw "[t]wo individuals [who] appear[ed] to be fighting, and another person trying to break them up," and she called 911 to report the altercation. Officer Kimberly Mason with the Cordele Police Department responded to Faircloth's 911 call. According to Officer Mason, she arrived at the apartment complex around 3:00 p.m., and she saw "a male subject pulling a female" — whom she later determined to be Boone and Williams — "across the road." Williams was "initially on the ground" and was not wearing any shoes. Officer Mason testified that she believed she was "witnessing a domestic [disturbance]," so she "activated [her] lights, which also turned on [her] body camera,"[2] and she "immediately detained" Boone. As Officer Mason was handcuffing Boone, Boone repeatedly said that Williams, who was standing in front of Officer Mason's patrol car, "robbed and helped kill him. She robbed and helped kill him." Officer Mason removed

---

[2] Officer Mason's bodycam footage was admitted without objection at trial and played for the jury.

part of a hacksaw blade from Boone's pocket before placing him in the back seat of her patrol car.

Officer Michael Middleton with the Cordele Police Department also responded to Faircloth's 911 call that afternoon and arrived on the scene shortly after Officer Mason. Because Officer Mason was involved with Boone at the time, Officer Middleton "made contact with the female," Williams. After Officer Middleton spoke with Williams and learned that an incident had occurred at Holt's apartment, Officer Middleton "escorted" Williams back to Holt's residence by placing her "in the back seat of [his] patrol car" and following her directions to Holt's apartment. When they arrived at the complex, Williams "walked [Officer Middleton] up to [Holt's] apartment." Officer Middleton observed that the screen door to the apartment was closed, but the "main door" was "cracked open." Officer Middleton looked inside the apartment and "saw a male subject leaning against a piece of furniture, sitting on the floor, with a box cutter sticking out of his neck." Officer Mason testified that she also went to Holt's apartment and looked inside, and when she

did so, she saw Holt, who appeared to be deceased, "sitting on the floor, leaned up against the couch, with [ ] what appeared to be a box cutter sticking out of . . . the front of his neck." Neither Officer Mason nor Officer Middleton entered Holt's apartment. Following the officers' viewing of the interior of the apartment, Officer Middleton detained Williams.

Sarah McGee, who lived in an apartment across from Holt's, testified that she saw Williams approaching Holt's apartment on the afternoon of March 18,[3] and a short time later, she heard a "commotion" coming from Holt's apartment, including "a lot of cussing and going on, and bad words." McGee testified that she heard Williams tell Holt that he "wasn't going no damn where."

GBI Special Agent David Smith, who was admitted as an expert in crime scene analysis and blood-stain pattern analysis at trial, testified that he and another GBI agent processed Holt's

---

[3] McGee testified that Williams frequently came over to Holt's apartment and "stay[ed] the night"; had "sex in his house" with "different men" while Holt was away; and "stole [Holt's] money and his food and sold it." Holt's niece, Mary, also testified that Williams was often at Holt's apartment and took Holt's money "to support her [drug] habit."

apartment on March 18. Agent Smith testified that, upon entering the apartment, they found Holt's body positioned on the floor of the living area, leaning back against a loveseat. Paramedics with Crisp County Emergency Medical Services pronounced Holt dead at the scene. Agent Smith testified that he observed a "box cutter" or "razor knife" sticking out of Holt's neck. Agent Smith also observed "sharp force trauma injuries" on Holt's neck, head, arms, and hands where Holt had been "cut or stabbed." In "the middle of the loveseat" directly behind Holt, Agent Smith noted the presence of a "large bloodstain," indicating a significant "bloodletting event" occurred there, as well as blood "spatter stains" on various surfaces around the living area of the apartment. On the loveseat behind Holt's body, Agent Smith found a single earring, and he collected part of "a hacksaw blade that had blood on it." Agent Smith also collected a black wig with bloodstains on it on the floor next to Holt's body, as well as a shoe near the front door that had "shards of glass" embedded "in the bottom of it." In the kitchen, Agent Smith noted "a significant quantity of broken glass and the neck to a liquor bottle

6

still in the corner." In the bedroom, Agent Smith located "the matching shoe" to the one recovered by the front door, a "dark green Under Armour hoodie," and a "white tee shirt." Several stains Agent Smith observed on the hoodie and tee shirt were submitted for "presumptive blood testing" and "tested positive for blood." The Under Armour hoodie was later determined to belong to Boone.

On the evening of March 18, Agent Smith met with Williams at the Cordele Police Department and photographed her, at which point he noticed she was wearing only one earring "similar" to the earring he "collected at the scene" on the loveseat behind Holt. Agent Smith also noted that Williams had a cut on one of her left fingers and "a small transfer bloodstain on the cuff of her left sleeve of her shirt." As for Boone, Agent Smith photographed the clothing Boone was wearing at the time of his arrest, and Agent Smith testified that Boone's blue jeans had observable bloodstains on "the left knee," which later "tested positive" for blood.

The medical examiner testified that, during Holt's autopsy, she observed "five sharp force injuries" to Holt's neck, four of which were

7

stab wounds approximately two to three inches in length. In one of the four stab wounds, the medical examiner "recovered a piece of a blade of a sharp force object" that was "consistent with" a "utility knife," which had apparently "broke[n] off into this wound and embedded itself into the ligament, the bone, and a muscle." The fifth neck wound was "an incised wound" or "slashing type" of wound, part of which was a "little jagged," and was "consistent with" the hacksaw blade recovered by law enforcement at the scene. Additionally, the medical examiner observed that Holt had "blunt force injuries" on "the back of his right scalp area," which would have "been consistent with being hit with a glass bottle." According to the medical examiner, Holt's cause of death was "multiple sharp force injuries," and although she could not determine which of the wounds in Holt's neck came first, she testified that three of those wounds "would have been fatal."

On the evening of March 18, after being advised of and waiving his *Miranda*[4] rights, Boone was interviewed by two GBI agents,

---

[4] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694)

8

Agent Andrew Albertson and Agent Clint Karsten, while Boone was in custody at the Cordele Police Department. During that custodial interview, which was video-recorded, Boone admitted to and described his involvement in Holt's death, as well as explained his personal history with Holt and Williams. Boone also wrote a statement in which he apologized to Holt's family for Holt's murder.[5]

According to the statements Boone made during his March 18 custodial interview, Boone moved to Cordele in June 2018, and shortly afterward, he "got involved with" Williams, whom he described as "on drugs real bad," a "compulsive liar," and "crazy." Boone stated that, a few months after he became romantically

_____

(1966).

[5] Prior to trial, the State provided notice of its intent to introduce Boone's video-recorded custodial interview and written statement at trial, which Boone then moved to suppress. The trial court held a *Jackson-Denno* hearing on May 19, 2021. See *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964). On May 21, 2021, the trial court issued an order denying Boone's motion to suppress, concluding that Boone's custodial statements were freely and voluntarily made to law enforcement and that his interview and written statement were admissible at trial. At trial, Boone's March 18 custodial interview — with several stipulated redactions — was admitted into evidence during the testimony of Agent Albertson and played for the jury. Boone's written statement, as well as a diagram he drew of the interior of Holt's apartment during the March 18 interview, were also admitted at trial.

involved with Williams, he met Holt at Holt's apartment when he accompanied Williams there. Boone said Williams would frequently "hang over" at Holt's apartment to "turn tricks" and "do drugs,"[6] and she had also "stolen money" from Holt to buy drugs. Boone said he knew Holt was also romantically involved with Williams "off and on," and although he and Holt "shared a woman," Boone and Holt were friends.

According to Boone, in mid-March 2019, Boone started staying at Holt's apartment because Boone was homeless and "had nowhere else to go." On the morning of March 18, Holt left the apartment for a while, and when he returned, he told Boone he had seen Williams while he was out. Holt apparently told Williams he had gotten some money so she would come over to the apartment.[7] As Boone described what happened next, he gave the GBI agents several differing accounts. In his final account, Boone stated that, while Holt

---

[6] Boone explained that Williams would "turn tricks" in exchange for drugs or to earn drug money, and Holt would sometimes let her use his apartment for that purpose.

[7] Boone told the GBI agents that Williams came over to Holt's apartment whenever she thought Holt had money.

was away from the apartment that morning, Williams came over and told Boone about Holt's money. Williams told Boone they were "going to rob" Holt and use the money to go to Knoxville, and she needed Boone to "hold him." Williams planned to "knock Holt out and take the money." Boone said he and Williams then had sex, and she left with a plan to return that afternoon around 1:00 or 2:00 p.m.

According to Boone, around 2:15 p.m. on March 18, Williams returned to Holt's apartment and demanded money from Holt. Boone said that, when Holt told Williams he did not have any money, Williams got angry. Holt went into the kitchen; Williams followed and hit Holt over the head with a "tall liquor bottle." Boone said that Holt "stumbled" into the living room and "fell on the sofa chair." Boone said it was apparent Williams had failed to "knock [Holt] out" with the liquor bottle as she planned, and "that's when things went south." Boone said Williams "grabbed a carpenter knife" — he also described it as a box cutter — and started stabbing Holt. Holt "was still breathing" and trying to get up, so Boone "stabbed him, too." Boone pulled the knife out, "wiped the blade" on

11

Williams's "hair, her wig," and stabbed Holt again. Boone indicated that, as he was stabbing Holt, the blade broke off in Holt's neck. At this point, Holt was still breathing, so Williams put a pillow over Holt's mouth while Boone kneeled on Holt and held his arms down until he "didn't breathe no more." Boone admitted that he owned and had used a hacksaw blade to stab Holt — part of which was found in Boone's pocket when he was arrested and part of which was found on the loveseat behind Holt.

Boone said that, after they stabbed Holt, Williams quickly changed clothes and ran out of the apartment without her shoes. Boone kept on the same clothes — except for his Under Armour hoodie — because they were all he had. Boone stated that, when Williams ran out of the apartment, he was concerned she would run away and blame him for everything, so he followed her. Boone said he was not going to let Williams leave his side because "[i]f [he] was go[ing] down, [she was] going down, too." When Boone and Williams got outside, they encountered a "dude" — later identified as Bell — whom Williams grabbed, "acting crazy." Boone explained that he

wanted to get Williams away from the "dude" and also prevent her from leaving and letting Boone be held "responsible for murder," which was why he was dragging Williams and holding onto her.

1. Boone first contends that the evidence in this case was insufficient as a matter of constitutional due process to convict him of the crimes charged under *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). Boone also argues that, as a matter of Georgia statutory law, the evidence was "insufficient to support the verdict" under OCGA § 24-8-823 because "the only evidence of guilt" was Boone's "uncorroborated oral and written statements." These claims fail.

When we review the "constitutional sufficiency of the evidence," we review the "evidence at trial in the light most favorable to the verdicts to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt, without weighing the evidence or resolving conflicts in testimony." *Hooks v. State*, 318 Ga. 850, 852 (2) (a) (901 SE2d 166) (2024). And, "[w]e defer to the jury's resolution of any conflicts in the evidence,

13

the credibility of witnesses, and the drawing of reasonable inferences from the facts." Id. See also *Ridley v. State*, 315 Ga. 452, 455 (2) (883 SE2d 357) (2023) ("In making this determination, we do not evaluate witness credibility, resolve inconsistencies in the evidence, or assess the weight of the evidence; these tasks are left to the sole discretion of the jury.").

Here, the evidence was sufficient as a matter of constitutional due process for the jury to find Boone guilty of the murder and aggravated assault of Holt. See *Ridley*, 315 Ga. at 455 (2). That evidence established that, on the afternoon of March 18, Boone was observed by several witnesses outside of Holt's apartment, and when Boone was detained shortly thereafter, he repeatedly told the arresting officer that Williams, who was standing nearby, "robbed and helped kill him." At that time, Boone had blood on his clothing and was carrying part of a hacksaw blade — another piece of which was found at the crime scene and was consistent with causing one of Holt's stab wounds. Additionally, during Boone's custodial interview with law enforcement later that evening, Boone described

14

the crime scene and Holt's death in detail, as well as admitted to an ongoing romantic relationship with Williams, his involvement in planning the attack on Holt, and his role in holding Holt down and stabbing him to death.

Moreover, Boone was charged individually and as a party to the murder and aggravated assault of Holt, and we have said that "[a] defendant is guilty as a party to a crime if he '(i)ntentionally aids or abets'" in the commission of the crime. *Goodman v. State*, 313 Ga. 762, 767 (2) (a) (873 SE2d 150) (2022) (quoting OCGA § 16-2-20 (b) (3)). And, although "mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct before, during and after the offense." Id. (citation and punctuation omitted). In this case, the evidence — construed in the light "most favorabl[e] to the verdicts" — was sufficient to demonstrate that Boone "was more than merely present" for the murder and aggravated assault of Holt and to authorize the jury to find Boone guilty of these crimes. Id.

With respect to Boone's statutory claim that "[t]he evidence was insufficient to support the verdict because the only evidence against [Boone] was a confession that was uncorroborated by the evidence," we note that, under OCGA § 24-8-823, "[a] confession alone, uncorroborated by any other evidence will not justify a conviction." See *Norman v. State*, 298 Ga. 344, 346 (2) (a) (781 SE2d 784) (2016) (holding that "a defendant's entirely uncorroborated confession cannot support a conviction"). However, we have held that, "[f]or a confession to be sufficiently supported, [ ] other evidence need only corroborate it in any particular." Id.

> [W]hen the jury finds that a confession is corroborated, it need not find proof of guilt beyond a reasonable doubt from evidence separate from and wholly independent of the confession, and it instead may consider the confession along with other facts and circumstances independent of and separate from it.

Id. (citation and punctuation omitted).

"In this case, the State presented evidence corroborating" Boone's "confession in many particulars." *Norman*, 298 Ga. at 346 (2) (a). As discussed above, (1) several witnesses saw Boone near

16

Holt's apartment after his murder; (2) Boone told the arresting officer that Williams "helped kill him," later making clear that Boone was referencing Holt; (3) Boone had blood on his clothes and part of a hacksaw blade in his pocket at the time of his arrest; and (4) the other part of the hacksaw blade was found next to Holt's body at the crime scene. In addition, the "[p]hysical evidence found at the crime scene and testimony from the medical examiner corroborated" Boone's statements "about the manner in which" he and Williams assaulted and killed Holt. Id. "This corroboration was more than sufficient." Id.

Accordingly, we conclude that the evidence was constitutionally and statutorily sufficient to sustain the jury's verdicts against Boone for malice murder and aggravated assault.

2. Boone next contends that the trial court erroneously admitted evidence of a statement Boone made to a detention officer during his pretrial incarceration under OCGA § 24-4-404 (b) ("Rule 404 (b)"). While awaiting trial, Boone was incarcerated, and during his incarceration, he had an encounter with a detention officer,

17

during which Boone said — after the officer refused his request to pass a note to another inmate — "B***h, I am in here for murder, and I'll kill you, too." Prior to trial, the State provided notice to Boone of its intent to introduce evidence of this statement at trial under Rule 404 (b). Following a hearing, the trial court ruled that the statement would be admissible at trial on several grounds, including as intrinsic evidence, as a party admission, and as proof of Boone's intent under Rule 404 (b). Boone's statement to the detention officer was then admitted at trial over Boone's objection, which did not include an objection on hearsay grounds. See OCGA § 24-8-801 (d) (2) (A) (providing that "[a]dmissions shall not be excluded by the hearsay rule").

On appeal, Boone contends only that the trial court abused its discretion in admitting his statement to the detention officer for the purpose of showing his intent under Rule 404 (b). But, in light of the overwhelming evidence of Boone's guilt recounted in our sufficiency analysis above — including his own admission to law enforcement that he assisted in planning the attack on Holt and that he stabbed

18

Holt to death — we need not decide whether the trial court erred in admitting Boone's statement under Rule 404 (b) "because any error was harmless." *Ware v. State*, 303 Ga. 847, 852 (IV) (815 SE2d 837) (2018). See also *Parks v. State*, 300 Ga. 303, 308 (2) (794 SE2d 623) (2016) (concluding that "overwhelming" evidence of guilt rendered any erroneous admission of Rule 404 (b) evidence harmless, particularly where the defendant admitted that he shot victim).

"In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done[.] The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Kitchens v. State*, 310 Ga. 698, 702 (2) (854 SE2d 518) (2021) (citation and punctuation omitted). Given the overwhelming evidence of Boone's guilt in this case, see Division 1, it is "highly probable" that the evidence presented about Boone's statement — which consisted solely of brief testimony from the detention officer to whom Boone made the statement and from another detention officer who overheard it —

19

"did not contribute to the verdict" and, thus, was harmless. Id. (citation and punctuation omitted). Accordingly, this contention also fails.

3. Boone last contends that his trial counsel was constitutionally ineffective for failing to object to statements the prosecutor made about Boone's character during the State's closing argument. This claim also fails under the standard set forth in *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).

> To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. To satisfy the deficiency prong, a defendant must demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong.

*Moss v. State*, 311 Ga. 123, 126 (2) (856 SE2d 280) (2021) (citations

20

and punctuation omitted) (citing *Strickland*, 466 U. S. at 687-695).

During Boone's closing argument, his trial counsel told the jury there was "no forensic evidence linking [ ] Boone to these offenses" and that Williams was solely "responsible for this." Boone's trial counsel argued that Williams was "high on crack cocaine" that day; "[s]he realized there wasn't any money"; and "she lost it." Trial counsel explained that Boone was "attempting to downplay her role and his role, or however you want to see it, because he had a relationship with her. He was torn."

During the State's closing argument, the prosecutor told the jury that he "expect[ed] the judge to instruct [the jury] on party to the crime," and then, the prosecutor said,

> and let's get one thing straight. [Boone's trial counsel] and I agree on this. Katrea Williams is not a good person. I'm not up here before you to tell you that she is. She is not a good person. She is a murderer just like this defendant. . . . [T]he defense attorney and the defendant want to make you think, oh well you know what, she is a — and I'll apologize for the term, but she is a crack whore. That's what they — who is the crack whore's boyfriend? Who chooses to be with the crack whore? That's this defendant.

At Boone's motion-for-new-trial hearing, his trial counsel

testified that he did not object to the prosecutor's comment during the State's closing argument because he did not want to "draw more attention to it." Additionally, Boone's trial counsel explained that Boone's "whole theory was that [ ] Williams was the one that committed it. So, anything . . . [that] reflected badly on her, . . . it didn't really affect [Boone's] position." Trial counsel testified that he understood "they're saying that [Boone] was the boyfriend of her, but that was just more of why he was trying to cover for [her]." Boone's trial counsel acknowledged that the State did not call Boone "a crack whore," and Williams was, in fact, Boone's girlfriend, with whom he "chose" to be "involved." Trial counsel pointed out that this argument helped Boone's theory that he was "just merely present at the scene of the crime"; he "did not actually participate in the murder of Mr. Holt"; and "Miss Williams did all of it by herself." Boone was just "covering for her."

In the trial court's order denying Boone's motion for new trial, the trial court found that "[t]rial counsel's decision to not object to the statements was a strategic choice and not deficient

22

performance." The trial court further determined that Boone failed to show "how this strategic choice by trial counsel was 'patently unreasonable.'" We agree.

We have said that "[a] closing argument is to be judged in the context in which it is made." *Styles v. State*, 309 Ga. 463, 470 (4) (847 SE2d 325) (2020) (citation and punctuation omitted).

> A prosecutor is granted wide latitude in the conduct of closing argument, and within that wide latitude, a prosecutor may comment upon and draw deductions from the evidence presented to the jury. Whether to object to a particular part of a prosecutor's closing argument is a tactical decision, and counsel's decision not to make an objection must be patently unreasonable to rise to the level of deficient performance.

*Nesbit v. State*, 321 Ga. 240, 250 (913 SE2d 650) (2025) (citations and punctuation omitted).

To establish that his trial counsel performed deficiently, Boone must show that, "under the circumstances, the challenged action cannot be considered a sound trial strategy." *Zayas v. State*, 319 Ga. 402, 411 (3) (902 SE2d 583) (2024) (citation and punctuation omitted). "[E]lecting not to object to a closing argument that is not

23

unduly prejudicial or clearly improper to avoid drawing negative attention to the defendant or highlighting unfavorable evidence is a reasonable trial strategy." *Nesbit*, 321 Ga. at 251. See also *Young v. State*, 305 Ga. 92, 97-98 (5) (823 SE2d 774) (2019) (concluding that trial counsel's strategy of weighing the "upside of arguably objectionable [comments]" against "its downside" and ultimately deciding not to object to avoid drawing negative attention to the defendant was reasonable).

Under the circumstances presented in this case, we conclude that Boone failed to meet his burden of showing that his trial counsel was constitutionally deficient under *Strickland* for failing to object to the State's comment during closing argument because, as the record reflects, his trial counsel's decision not to object to the State's comment on the basis that it helped Boone's theory that he was merely present at the scene and was only covering for Williams was a reasonable one. See *Young*, 305 Ga. at 97-98 (5). Therefore, this ineffective assistance of counsel claim fails.

*Judgment affirmed. Peterson, C. J., Warren, P. J., and Bethel,*

24

*Ellington, McMillian, Colvin, and Pinson, JJ., concur.*

Decided June 10, 2025.

Murder. Crisp Superior Court. Before Judge Fachini.

*Shantay D. Hightower*, for appellant.

*Bradford L. Rigby, District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.