In the Supreme Court of Georgia

Decided: September 30, 2025

S25A0579. CRAWFORD v. THE STATE.

LAGRUA, Justice.

Appellant Carl Crawford appeals his convictions for malice murder and other crimes related to the shooting death of Juanita McFadden.[1] On appeal, Crawford argues that his convictions should be reversed based on the following contentions: (1) the trial court

---

[1] McFadden was shot and killed on November 18, 2020. On February 25, 2021, a Cobb County grand jury indicted Crawford for the following counts: malice murder (Count 1); felony murder predicated on aggravated assault (Count 2); aggravated assault (Count 3); aggravated battery (Count 4); theft by taking (Count 5); and possession of a firearm during the commission of a felony (Count 6). Crawford was tried from March 21 to 28, 2022, and the jury found Crawford guilty on all counts except theft by taking (Count 5). The trial court sentenced Crawford to life without the possibility of parole on Count 1 (malice murder) and five years, to run consecutively, on Count 6 (possession of a firearm during the commission of a felony). The remaining counts merged or were vacated by operation of law. Crawford filed a timely motion for new trial, which he later amended multiple times in 2023 through new counsel. After holding an evidentiary hearing on the motion for new trial, the trial court denied the motion on November 7, 2023. Crawford filed a timely notice of appeal on December 7, 2023, followed by an amended notice of appeal to this Court on February 21, 2024. The case was docketed in this Court to the April 2025 term and submitted for a decision on the briefs.

plainly erred by admitting evidence of McFadden's general good character at trial; (2) the trial court erred by allowing witnesses to give hearsay testimony about Crawford's alcohol abuse; (3) the trial court abused its discretion by allowing a non-eyewitness to opine about Crawford's state of mind during the homicide; (4) the trial court committed plain error by allowing a detective to opine about the meaning and significance of Crawford's text communications with others; and (5) the cumulative harm of the trial court's errors requires reversal. For the reasons that follow, we affirm Crawford's convictions and sentences.

The evidence presented at trial demonstrates that, shortly before 1:00 a.m. on November 18, 2020, Crawford shot McFadden approximately nine times in the entrance hall of the Cobb County apartment Crawford shared with Jarvon Whitehead, his long-time roommate. McFadden died at the scene. At trial, Crawford asserted that he was justified in shooting McFadden because he suffered from

2

battered person syndrome, allegedly caused by his abusive relationship with McFadden.[2]

In 2012, McFadden met Crawford and Whitehead when she attended a party at their apartment, and they all became close friends. Over the years, Crawford's relationship with McFadden was "rocky" — McFadden was known to have a bad temper and to anger easily — but she and Crawford "loved and cared" about each other and frequently "h[u]ng out" together. McFadden also briefly dated both Crawford and Whitehead, and she continued to be "involved sexually" with Whitehead from "time to time." Crawford expressed to several friends that he still wanted to "be in a [romantic] relationship" with McFadden, but she did not "reciprocate" those feelings. McFadden had begun dating another man in September 2020.

On the night of November 16, 2020, McFadden, who worked as a hair stylist, spent the night at Crawford's and Whitehead's apartment because it was close to the homes of several clients with

---

[2] Crawford presented expert testimony in support of this defense at trial.

whom she had hair appointments scheduled the next day, and while McFadden was at the apartment, she and Crawford got into a heated argument. On the morning of November 17, McFadden left the apartment, and McFadden's cell phone records show that, later that evening, several text messages were exchanged between McFadden's cell phone and Crawford's cell phone. According to McFadden's cell phone records, on the evening of November 17, McFadden's cell phone texted Crawford's cell phone, stating that McFadden would be coming over to the apartment later that night to pick up her personal items and "wo[uld]n't be back."[3] Crawford's cell phone responded, stating "that's probably best," and indicating that McFadden's stuff would be left "at the door." McFadden's cell phone then replied, "Don't touch my s**t"; "If my s**t outside, it's hell to pay." Crawford's cell phone then responded, stating "Guess I'll pay." Shortly thereafter, McFadden called Whitehead, who was out of town for work at the time, to tell him she and Crawford had

---

[3] McFadden lived with her mother in College Park, but she spent a lot of time at Crawford's and Whitehead's apartment and accumulated a number of personal belongings there.

4

an argument the night before; she wanted to "collect her stuff" from the apartment; and Crawford was threatening to "put her stuff outside," which "upset" her. Whitehead called Crawford and told him to let McFadden into the apartment to collect her things.

Sometime before midnight on November 17, McFadden contacted her boyfriend, Thomas Smith, and told him she was going over to Crawford's apartment and asked him to meet her there to help carry out her belongings and give her a ride home. Around 12:15 a.m. on November 18, McFadden arrived at Crawford's apartment, went inside, and stayed for about 20 or 30 minutes, gathering her personal items. During that timeframe, Whitehead received multiple calls from McFadden and Crawford. Whitehead testified that Crawford was very "upset" and "frustrated" that McFadden was at the apartment and "wanted her to leave." McFadden told Whitehead that she was "[w]aiting for a ride to come pick her up"; she got "most of her stuff to the front door"; there were "a few items she wouldn't be able to grab by herself"; and "once [her] ride arrived," she would gather those other things and leave.

5

Smith testified that he arrived at Crawford's apartment complex between 12:45 and 1:00 a.m., and he texted McFadden's cell phone to let her know he was there. McFadden's cell phone texted back and asked him "to come downstairs" to the apartment and "help her with her bags." According to Smith, as he "started to go downstairs" to Crawford's apartment, he heard gunshots and McFadden yell, "[D]id you just shoot me?"; followed by "multiple gunshots"; and McFadden "scream[,] [']You shot me.[']" Smith testified that he ran away from the apartment and called 911.[4]

Lieutenant Kenneth Owens with the Smyrna Police Department testified that he responded to the 911 call and arrived at the apartment complex "right before 1:00 in the morning" on November 18. Lieutenant Owens walked downstairs to Crawford's apartment, and when he "first had visibility of the apartment door, the door was open," and he saw McFadden lying "right in the middle of the doorway" with "a puddle of blood underneath her body."

---

[4] Smith's 911 call was admitted into evidence and played for the jury at trial.

6

Lieutenant Owens instructed Crawford to "come out of the apartment unarmed with his hands up …, which he did," and Crawford was detained "without incident."

At trial, the medical examiner testified that, "at minimum," McFadden was shot nine times, including in the "right forearm," "right breast," "middle and left side of the abdomen," "left hip," and "left thigh," and McFadden also suffered "a true fracture of … the right humerus," as well as a "slight fracture" of the pelvis. The medical examiner concluded that McFadden's cause of death was "multiple gunshot wounds of the torso."

Smyrna Police Detective Tasia Melvin also responded to the scene on November 18 and interviewed Crawford in the parking lot of the apartment complex. Before the interview, Detective Melvin advised Crawford of his *Miranda*[5] rights, and Crawford agreed to waive his rights and speak to Detective Melvin. The interview was recorded on Detective Melvin's body camera.[6] During Crawford's

---

[5] See *Miranda v. Arizona*, 384 US 436 (1966).

[6] The video footage from Detective Melvin's body camera, including Crawford's interview, was admitted at trial and played for the jury.

video-recorded interview, Crawford admitted that he shot McFadden, whom he described as his "roommate's ex-girlfriend," and that the gun he used to shoot her — a 9mm handgun — was on the couch in the apartment. Crawford then explained the circumstances surrounding the shooting. Crawford stated that, about an hour earlier, McFadden arrived at the apartment "to get her s**t," and he "kept telling her to get her stuff and just leave." Crawford said that McFadden was in the apartment for about 30 minutes, and while she was there, she kept "belittling" him; "calling [him] a b**ch"; and "putting her hands on him." Crawford told Detective Melvin that, after McFadden got her stuff and they were in the front hallway of the apartment, McFadden "started swinging on [him]" and "punching [him]." Detective Melvin asked Crawford how many times McFadden hit him, and he responded, "[a]bout 6 or 7 times." Crawford stated that, while McFadden was "swinging on" him, "[he] drew and [he] shot her," "about 5 or 6 times," with a 9mm he pulled from "[his] pants pocket." Crawford said he "typically" carried this handgun in his pocket, even "around the house."

8

Crawford stated that he shot McFadden because "[s]he's not fixing to just come over here and just keep putting her hands on me in my house. I have a right to defend myself. Period." Crawford was arrested at the conclusion of this interview.

After obtaining a search warrant, Smyrna Police Sergeant Ron Eaten photographed and processed Crawford's apartment on November 18. Sergeant Eaten testified that, upon arriving at the apartment, he found the apartment door open, and McFadden was positioned "in the [front] doorway" of the apartment, with one foot partially outside the front door. Sergeant Eaten located a 9mm handgun — which was later determined to be the murder weapon — "laying on the armrest of the couch," as well as extra 9mm bullets, "gun part[s]," and "gun magazine[s]" spread throughout the apartment. Sergeant Eaten photographed a bullet fragment "embedded" in the "door frame" of the front door, and he collected multiple shell casings and bullet fragments in the front hallway of the apartment and outside the front door.

During the early morning hours of November 18, Smyrna Police Detective Kristee Pettis spoke to Whitehead on the telephone. Detective Pettis testified that Whitehead explained to her that he was out of town, but he had spoken to Crawford and McFadden multiple times on the telephone shortly before the shooting occurred. Whitehead told Detective Pettis that, sometimes, Crawford could be "heavy-handed," and "[h]e didn't know his own strength." Whitehead also said that he "felt like" the "whole murder" "didn't make sense," and he thought Crawford's "temper got the best of him." At trial, Whitehead testified that, over the years, he had witnessed and tried to "mediate" arguments between Crawford and McFadden, but he had never seen McFadden and Crawford "be violent toward each other" or ever witnessed "an incident where there had been any physical contact between the two of them."

On the morning of November 18, after being advised of and waiving his *Miranda* rights, Crawford was interviewed by Detective Pettis and another detective while he was in custody at the Smyrna

Police Department.[7] During this second video-recorded interview, Crawford again explained that McFadden had arrived at his apartment the night before to collect her things, and she stayed for "twenty to thirty minutes." Crawford said he told McFadden repeatedly to leave, and as he was "trying to get to the [front] door to open the door" to force her outside, she "just start[ed] swinging" at him in the front hallway and calling him, "b**ch," "s**t," and "p**sy," at which point, he "just shot her." Crawford said there had always been a lot of arguing between them, but it had never been physical "until today." The detectives asked Crawford if he had a gun on him when the altercation began, and he affirmed that the gun was already in his "pocket." The detectives asked whether McFadden had "a gun, a knife, anything like that" on her, and Crawford responded that "[s]he didn't have a gun" and he "didn't see the knife," but he "kn[e]w she carrie[d]" "[l]ike a pocketknife," a "little black one." The detectives asked if McFadden threatened to

<hr />

7 Crawford's interview was video-recorded, and that interview was later transcribed by a court reporter and presented to the jury at trial — both in video and written format.

stab Crawford that night, and Crawford responded that McFadden did not pull a knife on him; he just knew her to carry one. Crawford said McFadden hit him "six or seven" times with "closed fists," but he did not sustain any injuries or bruising. Crawford also told the detectives that the front door was still closed when he shot McFadden, and Detective Pettis advised him that, when the police officers arrived and observed McFadden's body, she was lying "through the door and her feet were outside." Crawford said he might have moved her body after the shooting, and Detective Pettis responded that McFadden's body did not appear to have been moved; that police officers located shell casings outside the front door, as well as a bullet fragment in the door jamb; and that someone standing outside the apartment at the time of the shooting clearly heard McFadden say, "Did you just shoot me." When Detective Pettis told Crawford that he shot McFadden "nine times," Crawford said he did not realize he shot her that many times and insisted that he only shot her because she kept putting her "hands on" him and "wouldn't leave." Crawford said he "didn't want to kill nobody

12

today," but he was "always told[,] if you're gonna shoot, shoot to kill." At trial, Detective Pettis testified that law enforcement officers did not "find any weapons whatsoever on" McFadden or in her immediate vicinity.

At trial, Crawford testified in his own defense, and for the first time, he stated that, before the night of the shooting, there had been "physical violence" between him and McFadden. According to Crawford, McFadden had "slapped," "kick[ed]," "pushed," and "shove[d]" him on several prior occasions, and he testified that she was also known for carrying a knife, "maybe 3, 4 inches long." Crawford said he did not tell the detectives about this violence or the knife during his custodial interviews because he was "embarrassed." When Crawford's trial counsel asked whether, on the night of the shooting, McFadden "threatened to kill" him, Crawford responded, "She threatened to stab me. I would assume that she wanted to kill me." Crawford said he "was afraid for [his] life" and that he "kill[ed] [McFadden] intentionally" because he "was trying to defend [him]self." Crawford later conceded on cross-

13

examination that he never saw McFadden with a weapon that night; that she never threatened him with a weapon; and that the front door was already open when the shooting occurred.

Crawford presented the testimony of several friends at trial, who testified that Crawford and McFadden had many arguments, of which McFadden was typically the instigator, and she would yell at and "belittle" Crawford during those arguments. A few of Crawford's friends said they had witnessed McFadden strike Crawford on occasion, while others testified that they had only witnessed "verbal aggression" between them.

Crawford also presented expert testimony from Dr. Marti Loring, a clinical social worker and sociologist, who was qualified as an expert in "sociology and social psychology." Dr. Loring testified that Crawford had "symptoms and characteristics of battered person syndrome and of severe trauma," including "helpless[ness]," "hopeless[ness]," and memory loss, and "his behavior was sometimes that of a person very frightened and fearful for his life." According to Dr. Loring, on the night McFadden died, Crawford's condition was

14

"very severe," and "[h]e was terrified," leading him to go into "shock" and shoot McFadden multiple times.

1. Relying on OCGA §§ 24-4-404(a)(2) and 24-4-405(a),[8] Crawford first contends that the trial court erred by allowing McFadden's mother to testify that her daughter was "nice" and "beautiful" and had a "good spirit" because this testimony was inadmissible good-character evidence. In support of this contention, Crawford argues that, because he raised a "self-defense informed by battered person syndrome" defense at trial pursuant to OCGA § 16-3-21(a) (providing that "a person is justified in using force which is intended or likely to cause death or great bodily harm only if he ... reasonably believes that such force is necessary to prevent death or

---

[8] Under OCGA § 24-4-404(a)(2),

> [e]vidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion, except for ... evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor.

Id. OCGA § 24-4-405(a) provides that, "[i]n all proceedings in which evidence of character or a trait of character of a person is admissible, proof shall be made by testimony as to reputation or by testimony in the form of an opinion." Id.

15

great bodily injury to himself ... or to prevent the commission of a forcible felony"), and because his defense theory depended upon the jury's belief that McFadden behaved violently toward Crawford, McFadden's mother's description of McFadden as a "beautiful, nice person" was improperly admitted and clearly affected the outcome of his trial.

As Crawford concedes on appeal, he failed to object to the admission of McFadden's mother's testimony at trial, so we review his claim for plain error only. See *McKinney v. State*, 307 Ga. 129, 133 (2019) (explaining that, because the appellant did not object to the disputed testimony at trial, the "claims are reviewed only for plain error"). For an appellant to establish plain error, he must establish the following: (1) "there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned … by the appellant"; (2) "the legal error must be clear or obvious"; (3) "the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court

16

proceedings"; and (4) "if the above three prongs are satisfied, the appellate court has the discretion to remedy the error," but "only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Wipfel v. State*, 320 Ga. 84, 87 (2024) (quotation marks omitted). "An appellant must establish all four elements of the test in order to demonstrate plain error, so satisfying this test is difficult, as it should be." Id. (quotation marks omitted). In this case, even if Crawford had satisfied the first two prongs of the plain-error test, Crawford has not satisfied the third prong because he has failed to show that the admission of McFadden's mother's testimony "affected the outcome of the trial court proceedings." Id. (quotation marks omitted).

The evidence presented in this case was substantial and included Crawford's admission that he shot McFadden multiple times, even though she was not armed and did not threaten him or injure him, as well as his inconsistent statements about what led to her death. The evidence also included Whitehead's testimony that he had never seen any violence between McFadden and Crawford

17

during the years they had been friends and that, in his opinion —

based on his communications with Crawford prior to the shooting —

Crawford's temper led to the shooting of McFadden. Detective Pettis

also testified that McFadden was not armed with a weapon when

the shooting occurred. Additionally, while McFadden's mother

briefly described McFadden's positive attributes at trial, she also

testified about McFadden's tendencies to anger and become

argumentative, and Crawford and his friends testified at length

about McFadden's volatile nature and her hostile treatment of

Crawford.

Given the considerable evidence in this case — including the

negative-character testimony about McFadden — Crawford has not

shown that the passing references to McFadden's good character,

which were elicited from her own mother, likely affected the outcome

of the trial court proceedings. See *Watson v. State*, 303 Ga. 758, 761

(2018) (determining there was no plain error where it was "not

probable that the jury would have reached a different verdict had it

not heard [the challenged evidence]"). Thus, Crawford has not

demonstrated plain error, and this claim fails.

2. Crawford next contends that the trial court erred by admitting hearsay testimony describing Crawford's alcohol abuse at trial. Specifically, Crawford claims that certain of the trial testimony from McFadden's mother — to which he did object — and certain of the trial testimony from Whitehead — to which he did *not* object — repeated McFadden's out-of-court statements describing Crawford's drinking, and because those statements were relied upon by the State for their truth, the trial court erred in admitting them. See OCGA § 24-8-801(c) (providing that hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). For the reasons explained below, this claim fails.

(a) At trial, the State sought to introduce evidence of Instagram "conversations" between McFadden and her mother, and Crawford objected to this evidence based on relevance and hearsay. The trial court overruled the objection and allowed the evidence to be admitted, concluding that it was relevant to Crawford's battered-

19

person defense and helped demonstrate the nature of the "exact relationship" between McFadden and Crawford. McFadden's mother testified that, during one of her Instagram conversations with McFadden in early 2020, McFadden expressed concerns about Crawford's alcohol use. McFadden's mother testified that McFadden's father struggled with a drinking problem, and so, McFadden wanted to know what her mother did to "get him to stop drinking."

On appeal, Crawford argues that the "wrongly admitted hearsay testimony" from McFadden's mother was harmful because "Crawford's drinking was one of the few bases upon which the jury could have rejected the presumption that Crawford's actions were justified." We disagree and conclude that, even if the trial court erred in admitting this testimony, the error was harmless.

"In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done. The test for determining nonconstitutional harmless error is whether it is highly probable

that the error did not contribute to the verdict." *Boone v. State*, 321 Ga. 820, 827 (2025) (cleaned up). As noted in Division 1, the evidence of Crawford's guilt in this case was strong, and it included Crawford's statements that, on November 18, 2020, he shot "to kill" McFadden after she swung at and punched him, shooting her at least nine times. And Crawford admitted that, on the night of the shooting, McFadden did not have or threaten him with a knife or any other kind of weapon, and Crawford suffered no injuries as a result of their altercation. Detective Pettis also testified that McFadden was not armed when Crawford shot her. Additionally, Whitehead, who lived with Crawford for more than a decade and who had spoken to Crawford and McFadden multiple times in the 30 minutes leading up to the shooting, testified that he had never witnessed any violence between Crawford and McFadden, and he thought Crawford's "temper got the best of him" that night. The evidence also reflected that McFadden was on her way out the door of the apartment when the shooting occurred —the front door was already open; McFadden had asked her boyfriend to come down to

21

the apartment to assist her with her bags; her boyfriend was on his way downstairs when he clearly heard multiple gunshots and McFadden's exclamations that Crawford had shot her; and McFadden's body was partially outside the front door when she fell — evidence that contradicted Crawford's assertion that McFadden was in the midst of attacking him when he shot in self-defense. And, at trial, Crawford testified on cross-examination that, during "the pandemic," he was drinking a lot of alcohol, and McFadden was concerned about him and "wanted him to be healthy."

In light of the significant evidence of Crawford's guilt in this case and Crawford's own testimony that he was drinking heavily in 2020 and McFadden was concerned about him, it is highly probable that — although McFadden's mother's testimony about Crawford's drinking relied upon out-of-court statements made by McFadden — this testimony did not contribute to the verdict. See *Kitchens v. State*, 310 Ga. 698, 702 (2021) (assuming error in the admission of hearsay testimony, it was highly probable that the admission did not contribute to the verdict given the strong evidence of appellant's

22

guilt). Accordingly, any trial-court error was harmless, and Crawford's claim fails.

(b) With respect to Crawford's contentions concerning Whitehead's trial testimony, Whitehead testified that, in 2020, he became concerned about the "frequency" of Crawford's drinking, and McFadden also told Whitehead she was worried Crawford "might have a problem with his drinking." On appeal, Crawford argues that the trial court abused its discretion by admitting this testimony because, in giving it, Whitehead partially relied on out-of-court statements made by McFadden. Crawford further argues that this hearsay evidence affected his substantial rights because "there is a reasonable probability" that it led the jury to reject his justification defense.

Our review of this claim is limited to plain error because Crawford failed to object when Whitehead gave this testimony at trial. See *Dees v. State*, ___ Ga. ___ (2025), S25A0600, slip op. at 6 (Ga. Sept. 16, 2025) (concluding that, because the appellant did not object to the law enforcement officers' hearsay testimony at trial,

"our review is for plain error only," which requires the appellant to show that the trial court made an error that "(1) was not affirmatively waived, (2) was clear and obvious …, (3) likely affected the outcome of the trial, and (4) seriously affected the fairness, integrity, or public reputation of judicial proceedings") (quotation marks omitted). After applying the plain-error test here, see id., we first conclude that Crawford failed to meet the second part of that test to show clear and obvious error because a portion of Whitehead's testimony was based on his own perceptions of Crawford's drinking and, thus, was admissible under OCGA § 24-7-701(a).[9] "A lay witness may relate his or her opinion as to the existence of any fact so long as the opinion is based upon the person's own experiences and observations, and so long as the matter referred to is within the

_____

[9] This statute provides that,
[i]f the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences shall be limited to those opinions or inferences which are: (1) Rationally based on the perception of the witness; (2) Helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and (3) Not based on scientific, technical, or other specialized knowledge within the scope of [OCGA §] 24-7-702.
OCGA § 24-7-701(a)(1)-(3).

scope of the average juror's knowledge." *Harris v. State*, 279 Ga. 304, 306 (2005). Because some of Whitehead's testimony was based on his "own experiences and observations" of Crawford's increased alcohol intake and because a person's apparent drinking problem is a matter "within the scope of an average juror's knowledge," it was not clear or obvious error for the trial court to allow this testimony from Whitehead at trial. Id.

Additionally, as to Whitehead's testimony recounting what McFadden told him about Crawford's drinking, the trial court did "not commit a clear and obvious error" by failing to exclude this testimony as hearsay "because the relevant authority did not make clear that the trial court was required to exclude this hearsay evidence when no one raised a hearsay objection." *Dees*, S25A0600, slip op. at 7. Accordingly, this claim fails.

3. Crawford next argues that the trial court abused its discretion under OCGA § 24-7-701(a) ("Rule 701(a)")[10] by allowing

---

[10] Again, Rule 701(a) provides that lay opinions are only admissible if they are "[r]ationally based on the perception of the witness"; "[h]elpful to a clear understanding of the witness's testimony or the determination of a fact

25

Whitehead to testify that Crawford shot McFadden "in anger" because this testimony was not founded on Whitehead's first-hand knowledge and was not helpful to the jury. We disagree.

During the State's direct examination of Whitehead, the prosecutor asked if Whitehead recalled speaking to Detective Pettis after the shooting and giving his opinion "about [Crawford's] temper that day." Crawford's trial counsel objected, arguing that the question "ask[ed] for speculation" and "ask[ed] for information [for] which [Whitehead] was not present" nor "privy to." In response, the State argued that, because Whitehead "already testified to having phone calls and text communications with both parties that night right up until the incident occurred," he could give his lay opinion "based on the events as they were happening." The trial court overruled Crawford's objection. Whitehead then testified, "The detective asked me if I thought that [Crawford's] temper got the best of him and I agreed it had."

in issue"; and "[n]ot based on scientific, technical, or other specialized knowledge." OCGA § 24-7-701(a)(1)-(3).

Again, Rule 701(a) "allows lay witness testimony in the form of opinions or inferences that are rationally based on the witness's perception, helpful to a clear understanding of the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge." *Bullard v. State*, 307 Ga. 482, 491 (2019) (quotation marks omitted). "Whether to allow such lay opinion testimony under Rule 701(a) is a matter for the trial court's sound discretion." Id.

We conclude that the trial court did not abuse its discretion in allowing Whitehead to testify at trial about Crawford's state of mind on the night of the shooting. Whitehead's testimony regarding Crawford's temper was based on what he personally observed in communicating through text messages and phone calls with Crawford and McFadden prior to the shooting and his own perceptions of Crawford's anger. See *Gude v. State*, 313 Ga. 859, 868 (2022) (determining that the trial court did not abuse its discretion by admitting a witness's testimony about her belief that the victim was scared or upset because that testimony was "perceived from her

27

text message conversation with him in light of her close personal relationship with him"). Additionally, Whitehead did not need specialized or technical knowledge to conclude that Crawford was angry. See *Harris*, 279 Ga. at 306 (holding that a witness may give his lay opinion "as to the existence of any fact" if the opinion is based upon the witness's "own experiences and observations" and if the matter referred to is "within the scope of the average juror's knowledge"). And Whitehead's testimony was also helpful to the jury because his determination that Crawford was angry with McFadden — based on Whitehead's familiarity with Crawford and his communications with Crawford prior to the shooting — helped the jury better understand the circumstances surrounding the shooting and reach a determination as to why Crawford shot McFadden that night. See *Mitchell v. State*, 320 Ga. 673, 679 (2025) (explaining that a witness's lay opinion testimony, which was based on his familiarity with the defendant, was admissible under Rule 701(a) because, among other things, it helped the jury "determine a fact in issue"). Therefore, because Whitehead's testimony was

28

permissible lay-opinion testimony under Rule 701(a), we see no abuse of discretion in the trial court's decision to admit it, and this claim also fails. See *Gude*, 313 Ga. at 868.

4. Crawford also contends that the trial court plainly erred under Rule 701(a) by allowing Detective Pettis to testify about the meaning and significance of certain text communications Crawford exchanged with his friends. During trial, Detective Pettis testified that, after obtaining a search warrant, she conducted an analysis of the data on Crawford's cell phone, and she ascertained — based on her training and experience in law enforcement — that some of Crawford's text exchanges referenced strains of marijuana and/or the use of marijuana. Detective Pettis also testified that, in some of Crawford's text communications with his friends, he discussed his relationship with McFadden and complained about her negative treatment of him.

On appeal, Crawford argues that Detective Pettis's testimony was improper because her opinions were not rationally based on her own perceptions. See OCGA § 24-7-701(a)(1). He further argues

that, even if it was permissible for Detective Pettis to testify — based on her experience — about certain drug references contained in Crawford's text communications, this testimony was not helpful to either "a clear understanding of the witness's testimony or the determination of a fact in issue," OCGA § 24-7-701(a)(2), because whether Crawford had used marijuana had no bearing on the crimes with which he was charged or the strength of his justification claim.

Crawford concedes that he did not raise these objections at trial, so we review this claim for plain error only. See *Henderson v. State*, 317 Ga. 66, 78 (2023) (noting that the plain error standard requires an appellant to show "not merely error," but also that the error "was not affirmatively waived," "was obvious beyond reasonable dispute," and "affected the outcome of the trial"). And, here, even if the trial court obviously erred in allowing Detective Pettis to testify about the content of Crawford's text communications, Crawford has not shown plain error because he has failed to establish that this testimony likely affected the outcome of his trial. See id.

30

Even without this testimony from Detective Pettis, the evidence against Crawford, as recounted above, was quite strong. Moreover, when Crawford testified in his own defense at trial, he testified that, in 2020, he was smoking marijuana "three to five times a week," and when Crawford's friends testified at trial on his behalf, they discussed their knowledge of Crawford's "rocky" relationship with McFadden — unobjected-to testimony that was largely cumulative of Detective Pettis's testimony about Crawford's drug references and his difficult relationship with McFadden. See *Durden v. State*, 318 Ga. 729, 733–34 (2024) (holding that any error in the admission of a detective's lay opinion testimony about the appellant did not affect the appellant's substantial rights under the plain error standard where the testimony was cumulative of other unobjected-to testimony). Therefore, given the otherwise strong case against Crawford, the admission of Detective Pettis's lay opinion testimony likely had no effect on the outcome of the trial, and Crawford's claim of plain error fails. See id.

5. In Crawford's final enumeration of error, he contends that,

even apart from any of his individual enumerations of error, the Court should conclude that the "combinations of the errors here" would "clear the threshold for reversal" under a cumulative-error theory. We disagree.

"To establish cumulative error a defendant must demonstrate that at least two errors were committed in the course of the trial and considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." *Huff*, 315 Ga. at 567–68 (2023) (quotation marks omitted). This Court "considers collectively the prejudicial effect, if any, of trial court errors." Id. at 568 (cleaned up).

In this case, even if the good-character evidence regarding McFadden, the hearsay testimony about Crawford's drinking, and Detective Pettis's testimony about Crawford's text exchanges with his friends should not have been admitted at trial, these combined errors did not deny Crawford a fundamentally fair trial. As noted above, the evidence of Crawford's guilt in this case was significant, and the brief description of McFadden's good character was offset by

32

a significant amount of testimony regarding the negative aspects of her character. Additionally, the hearsay testimony at issue was largely cumulative of other properly admitted evidence at trial, including Crawford's own testimony. See *Durden*, 318 Ga. at 733–34.

In light of the other substantial evidence heard by the jury in this case, we conclude that Crawford has not shown that "the multiple errors so infected the jury's deliberation that they denied him a fundamentally fair trial." *Greene v. State*, 316 Ga. 584, 608 (2023) (quotation marks omitted). See also *Huff*, 315 Ga. at 568 (holding that the appellant's cumulative-error claim failed because the appellant did not demonstrate that "the prejudicial effect of the assumed trial-court errors ... denied him a fundamentally fair trial, given the strong evidence against him"). Accordingly, Crawford's cumulative-error contention fails.

*Judgment affirmed. All the Justices concur.*